**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JOEL W. GADDIS, | ) | CASE NO. 1:18CV00032 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Joel W. Gaddis, ("Plaintiff" or "Gaddis"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be VACATED and the case REMANDED for further

consideration consistent with this decision..

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.   PROCEDURAL HISTORY

In July and August 2014, Gaddis filed an application for POD, DIB, and SSI, alleging a disability onset date of December 30, 1971,[2] and claiming he was disabled due to a learning disability, low IQ, and depression.  (Transcript ("Tr.") 251, 253, 295.)  The applications were denied initially and upon reconsideration, and Gaddis requested a hearing before an administrative law judge ("ALJ").  (Tr. 200, 204, 219, 224.)

On September 13, 2016, an ALJ held a hearing, during which Gaddis, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 89-131.)  On December 2, 2016, the ALJ issued a written decision finding Gaddis was not disabled.  (Tr. 64-88.)  The ALJ's decision became final on November 7, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On January 5, 2018, Gaddis filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14 & 16.)  Gaddis asserts the following assignment of error:

(1) Mr. Gaddis is disabled under 12.05(C).

(Doc. No. 14 at 7.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Gaddis was born in December 1971 and was 44 years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 80.)  *See* 20

---

[2]   Gaddis later amended his alleged onset date of disability to October 1, 2012.  (Tr. 96-97, 280.)

C.F.R. §§ 404.1563(c) & 416.963(c).  He has a high school education and is able to communicate

in English.  (*Id.*)  He has no past relevant work.  (*Id.*)

**B.    Medical Evidence**[3]

  **1.    Mental Impairments/Educational Records**

  In September 1977, at the age of 5, Gaddis underwent intelligence testing through the

North Olmsted, Ohio school district.  (Tr. 351.)  During the testing, his speech was poor, but

mostly intelligible.  (*Id.*)  Stanford-Binet Intelligence Scale testing yielded an IQ score of 71.

(*Id.*)  In 1981, Gaddis underwent Wechsler Intelligence Scale for Children ("WISC-R") testing

and obtained a verbal IQ of 68, a performance IQ of 55, and a full scale IQ of 59.  (Tr. 358.)

Gaddis also underwent Stanford-Binet testing in 1981, achieving an IQ score of 75.  (*Id.*)

  In September 1984, Gaddis moved to a new school district in St. Louis County, Missouri.

(Tr. 353.)  In this new school district, all his academic instruction was in a self-contained special

education classroom, with the exception of art and music.  (*Id.*)  In June 1985, Gaddis underwent

evaluation to determine if he still required special education services.  (*Id.*)  The evaluator noted

Gaddis' "development has been slow since birth" and he had been in "self-contained special

education programs" since preschool.  (*Id.*)  The evaluator also observed despite Gaddis'

intellectual test scores in the "upper limits of the Educably Mentally Handicapped range," he had

demonstrated significantly stronger academic and social skills.  (*Id.*)  Gaddis underwent the

Woodcock-Johnson Psycho-Educational Battery, obtaining a reading score of 85, a math score of

65, and a written expression score of 80.  (Tr. 356.)  He also underwent the WISC-R, which

---

[3]  The Court notes its recitation of the medical evidence is not intended to be
exhaustive, and is limited to the evidence cited in the parties' briefs.

yielded a verbal IQ of 66, a performance IQ of 65(69),[4] and a full scale IQ of 63.  (Tr. 358.)
Based upon these results, Gaddis continued to require special education services.  (Tr. 354.)

In November 1985, at age 13, Gaddis had moved to Illinois and underwent another
educational evaluation through his new school district.  (Tr. 361.)  The Woodcock-Johnson
Psycho-Educational Battery revealed scores below grade level in all areas, and his "overall
cognitive ability" was in the first to fifth percentile.  (*Id.*)  However, his reading scores indicated
potential to achieve in that particular area.  (*Id.*)

In January 1987, Gaddis moved to the Dayton, Ohio area and underwent yet another
academic evaluation.  (Tr. 363.)  The evaluators observed Gaddis' was "somewhere between that
associated with learning disabled and developmentally handicapped."  (*Id.*)  Gaddis underwent
the WISC-R, obtaining a verbal IQ score of 66, a performance IQ score of 70, and a full scale IQ
of 66.  (Tr. 364.)  Gaddis also underwent the Kaufman Test of Educational Achievement, where
math was his weakest area of testing.  (*Id.*)  The testing also indicated Gaddis had good reading
skills, but poor reading comprehension.  (*Id.*)  However, the evaluators noted Gaddis could "read
words but may not exhibit functional reading skills requiring comprehension and responding."
(*Id.*)

In February 1990, when Gaddis was 18 years old, he underwent a diagnostic evaluation
at Blue Valley North High School, located in Kansas.  (Tr. 374.)  The evaluators concluded
Gaddis would require "guided attention to be able to tackle the jobs, expectations, and
responsibilities thrust upon him as an adult."  (*Id.*)  Gaddis was also noted to be "quite motivated
and willing to learn," but would require "more structured experiences to be able to handle

---

[4]     Gaddis' Performance IQ was presented in the school record in this manner.  (Tr.
358.)

adulthood." (*Id.*)  A career ability placement survey indicated Gaddis was "below average" in mechanical reasoning, verbal reasoning, manual speed, and dexterity.  (Tr. 368.)  He scored "low" in language usage, word knowledge, and perceptual speed and accuracy.  (*Id.*)  He received "very low" scores in the areas of spatial relations and numerical ability.  (*Id.*)  Gaddis also underwent WAIS-R testing, obtaining a verbal IQ of 72, a performance IQ of 75, and a full scale IQ of 73.  (Tr. 369.)

As an adult, Gaddis underwent neuropsychological testing with psychologist Paula Ogrocki, Ph.D., on March 29, 2016.  (Tr. 962.)  Dr. Ogrocki noted Gaddis' history of developmental delays and special education.  (*Id.*)  She observed Gaddis had previously received disability payments until 2012, when he attempted to work.  (*Id.*)  Gaddis reported difficulty with multitasking, memory, and following complicated instructions.  (Tr. 963.)  He indicated he never was able to drive, due to a history of seizures.  (*Id.*)

During the testing, Gaddis's affect was restricted, he had difficulty tracking instructions, and completing testing tasks.  (Tr. 964.)  Dr. Ogrocki administered the "lower level difficulty test battery" due to "low IQ and degree of cognitive impairment."  (*Id.*)  However, Gaddis displayed good effort and Dr. Ogrocki concluded his results were "reliable and valid."  (*Id.*)

Gaddis scored a full scale IQ of 50, which was in the extremely low range, a verbal comprehension score of 63, a perceptual reasoning score of 52, a working memory score of 50, and a processing speed score of 59.  (Tr. 964-965.)  Dr. Ogrocki concluded Gaddis' full scale IQ fell in the extremely low range, Gaddis reading skills were at the 4th grade level, and his math skills were at the kindergarten-level.  (Tr. 965.)  He had severely impaired auditory and verbal memory, attention, and complex information processing.  (*Id.*)

Based upon this evaluation, Dr. Ogrocki concluded Gaddis' overall IQ was within "the range of mild intellectual disability." (*Id.*)  She observed there was "clear evidence of a developmental delay," concluding "an individual with this level of intellectual and cognitive functioning would have great difficulty maintaining employment in an unsupported/special services work environment." (*Id.*)

Gaddis also received mental health treatment as an adult.  On August 26, 2016, Gaddis followed up with psychiatrist Kong Young Kwon, M..D., for his bipolar disorder.  (Tr. 1011.) He reported hearing voices, poor sleep, mood swings, and paranoia. (*Id*.)  During this office visit, Gaddis was not agitated or in distress. (*Id*.)  Dr. Kwon prescribed Seroquel, Trileptal, Zyprexa, and Lithium Carbonate.  (Tr. 1012.)

### 2.     Physical Impairments

On March 21, 2014, Gaddis visited pain management physician Daniel Callahan, M.D., reporting bilateral lumbar radicular pain after falling on ice.  (Tr. 852.)  On examination, Gaddis displayed "patchy sensory changes but nothing specific to a dermatone." (*Id*.)  Dr. Callahan recommended a series of lumbar epidural steroid injections. (*Id*.)

Gaddis subsequently underwent a series of three lumbar epidural steroid injections on March 25, 2014, April 8, 2014, and May 1, 2015.  (Tr. 881, 869, 857.)  He experienced no relief from these injections.  (Tr. 857.)

Gaddis returned to Dr. Callahan on May 6, 2014, and Dr. Callahan ordered an EMG and adjusted Gaddis' medication from Percocet to Vicodin.  (Tr. 847.)  Gaddis saw Dr. Callahan again on June 26, 2014, reporting while his Vicodin relieved his pain for about 8 hours, he was having episodes of his leg "giving out." (Tr. 843.)  His neurological examination was normal.

6

(*Id.*)

A July 10, 2014 lumbar spine MRI revealed degenerative changes in the lower lumbar spine, most pronounced at the L4-5 level.  (Tr. 892.)  It also indicated a left foraminal disc protrusion, which resulted in moderate left neural foraminal narrowing, as well as moderate to severe bilateral foraminal narrowing at L5-S1.  (*Id.*)

Gaddis followed up with Dr. Callahan on August 5, 2014.  (Tr. 839.)  He reported daily headaches and paresthesia in his legs.  (*Id.*)  His neurological examination revealed some "patchy sensory changes."  (*Id.*)  Dr. Callahan prescribed Topamax, Meloxicam, and Vicodin.  (*Id.*)

On October 28, 2014, Gaddis visited Maria Luz Tabbakh, CNP, a nurse practitioner at Dr. Callahan's office.  (Tr. 835.)  Gaddis reported constant back pain and difficulties with standing, walking, and household chores.  (*Id.*)  Ms. Tabbakh reviewed Gaddis' prescription history, noting he had received Norco prescriptions from the emergency room and his dentist.  (*Id.*)  As this was a violation of his opioid contract, Ms. Tabbakh informed Gaddis the office would no longer prescribed Norco.  (*Id.*)  She prescribed Gabapentin and Topamax.  (Tr. 836.)

Gaddis visited Dr. Callahan on January 30, 2015, reporting lower back pain, neck pain, and headaches.  (Tr. 831.)  Dr. Callahan prescribed Amitriptyline and Topamax.  (Tr. 833.)  On February 23, 2015, Gaddis reported continued lower back pain, which radiated into his legs.  (Tr. 827.)  Dr. Callahan noted Gaddis recently visited the emergency room for severe leg pain and improved after receiving a morphine injection.  (Tr. 828.)  Dr. Callahan prescribed Topamax and Amitriptyline.  (Tr. 829.)  He also discussed the possibility of a chronic pain rehabilitation program with Gaddis. (Tr. 829.)

C.      **State Agency Reports**

1.      **Mental Impairments**

On September 23, 2014, Gaddis underwent a consultative examination with psychologist Natalie M. Whitlow, Ph.D.  (Tr. 491-498.)  He described problems with "reading, understanding, and writing."  (Tr. 492.)  He discussed his work history, noting he had a "hard time completing the tasks that they want done because I get confused and overwhelmed and can't understand the directions or what I am supposed to do."  (*Id*.)  Gaddis reported he graduated high school, but was held back several times and received special education services throughout his academic career.  (*Id*.)  He also reported an "extensive history of being terminated from jobs due to his poor comprehension, difficulty grasping and understanding concepts, and poor performance and productivity.  (Tr. 493.)

Upon examination, Gaddis' cognitive functioning "appeared to be below the normative range of functioning."  (Tr. 494.)  He demonstrated poor reading skills, poor speech and grammar patterns, and slowed comprehension.  (Tr. 494, 496.)  Dr. Whitlow observed Gaddis "demonstrated difficulty communicating his thoughts and experiences and presented as very confused."  (Tr. 495.)

Based upon this examination, Dr. Whitlow diagnosed Gaddis with Intellectual Disability and Persistent Depressive Disorder.  (Tr. 496.)  She provided the following opinion regarding Gaddis:

> **Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions**
>
> The claimant appears to have significant limitation on this functional assessment area, which is evidenced by his Intellectual Disability diagnosis, his reported academic history that identified that he received special

8

education services throughout his academic career and was identified with [unknown] learning and intellect-related disabilities, and his reported work history in which he has had ongoing difficulty with carrying out instructions and has been habitually incapable of meeting productivity and performing the tasks of the jobs that he has had.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks**

The current evaluator did not gather any evidence to support that the claimant has limitations in maintaining attention and concentration.

The claimant appears to have significant limitations with maintaining persistence and pace while performing simple and multi-step tasks, which is evidenced by his Intellectual Disability diagnosis, his reported academic history that identified that he was placed in special education classes partially because of his inability to complete the academic tasks and assignments, his reported work history that identified that he has been habitually incapable of meeting productivity and performing the tasks of the jobs that he has had, and his overall self-report and in-evaluation presentation that he becomes overwhelmed and confused which makes him incapable of performing simple and multi-step tasks.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting**

The current evaluator did not gather any evidence to support that the claimant has limitations on this functional assessment area.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting**

The claimant appears to have limitations on this functional assessment area, which is evidenced by his Intellectual Disability diagnosis. Specifically, the claimant's mental health symptoms cause him to behave and interact at a developmentally lower level than what he is expected to be on for his age and thus, stressors that are meant for the average person his age are very likely to overwhelm and confuse him and cause him to respond inappropriately in the work setting. Therefore, the more pressure the claimant experiences within the work setting, the more he will experience mental health symptoms that will compromise his thinking, judgment, behaviors, and decision-making.

9

(Tr. 497-498.)

On November 25, 2014, state agency psychologist Todd Finnerty, Psy.D., reviewed Gaddis' medical records and completed a Psychiatric Review Technique ("PRT") and a Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 172-173, 175-177.) He concluded Gaddis had (1) moderate restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation. (Tr. 172.) With respect to Gaddis' mental functional limitations, Dr. Finnerty found Gaddis was not significantly impaired in his abilities to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) maintain attention and concentration for extended periods; (5) make simple work-related decisions; (6) be aware of normal hazards and take appropriate precautions; (7) travel in unfamiliar places or use public transportation; and (8) set realistic goals or make plans independently of others. (Tr. 176-178.) He found Gaddis was moderately limited in his abilities to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (7) respond appropriately to changes in the work setting. (*Id.*) Dr. Finnerty explained the basis of his conclusions as follows:

> In Mini-[mental status exam] with AP, Claimant was able to remember 3/3 objects after 5 minutes and 10 minutes; However, in the [consultative

10

examination], the Claimant had a difficult time understanding and remembering where he had lived in the past.  He became verbally frustrated.

The examiner diagnosed an intellectual disability yet did not have access to testing or adaptive behaviors prior to age 22.  There is a reference to borderline IQs in the past/[continuing disability review].  A developmental onset of listing 12.05 is not established by the evidence.

Claimant is able to understand and remember short and simple instructions without difficulty.

***

Claimant reports a long history of work ending due to his inability to meet production standards.  Claimant claims he never knows how much change he should receive.  Claimant was unable to answer many cognitive questions correctly without attempting to answer.  Claimant was able to sustain concentration during [consultative examination.]

Claimant retains ability to sustain a routine without significant production quotas.

***

Claimant responds to stressors inappropriately as demonstrated in the [consultative examination] in regards to his past.  The [claimant] noted taking psychotropic medication but otherwise has no formal history of mental health treatment and has not evidenced a decompensation such as a psychiatric hospitalization.

Claimant is able to respond to small changes which do not put any extra stress on work.

(*Id.*)

On June 5, 2015, state agency psychologist Cynthia Waggoner, Psy.D., reviewed Gaddis'

medical records and completed a Psychiatric Review Technique ("PRT") and a Mental Residual

Functional Capacity ("RFC") Assessment.  (Tr. 140, 144-146.)  She affirmed the findings of Dr.

Finnerty.  (*Id.*)

11

2.      **Physical Impairments**

On September 30, 2014, state agency physician Anne Prosperi, D.O., reviewed Gaddis'

medical records and completed a Physical RFC assessment.  (Tr. 174-175.)  Dr. Prosperi

determined Gaddis could occasionally lift and carry 20 pounds and frequently lift and carry 10

pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; and sit for about 6

hours in an 8-hour workday.  (Tr. 174.)  She further found Gaddis could frequently climb ramps

and stairs, occasionally climb ladders, ropes, and scaffolds, occasionally stoop and crawl, and

frequently kneel and crouch.  (*Id*.)

On June 1, 2015, state agency physician Teresita Cruz, M.D., reviewed Gaddis' medical

records and completed a Physical RFC assessment.  (Tr. 142-144.)  She generally adopted the

findings of Dr. Prosperi, beyond finding Gaddis should never climb ladders, ropes, and scaffolds

and occasionally climb ramps and stairs.  (Tr. 142.)

**D.      Hearing Testimony**

At the outset of the September 13, 2016 hearing, Gaddis' counsel discussed how Gaddis

had previously received disability benefits from 2004 through 2012, but the benefits were

discontinued due to work activity.  (Tr. 96.)  Gaddis' counsel then provided the following

argument regarding Listing 12.05:

> The impairments here DDS noted that despite the findings at the consultative
> exam by Dr. Whitlow they did not consider Listing 12.05.  They indicated
> there was no evidence of testing and onset on file prior to age 22.  We were
> able to get the – a lot of the testing and things, Joel's father still had it, and
> that was used back in 2004 and he was placed on benefits without a hearing
> at that point.  The school records that were on file at the time DDS made
> their decision were really basically just transcripts.  There's some school
> records as far as grades and things like that.  That's about it.  These new
> records that I talked about are pretty telling here.  They've got IQ scores
> spanning basically his entire academic career.  There's a test in there from

12

1977 when he was five years in kindergarten with an IQ score – full scale IQ of 71 at that point.  There is an evaluation in 1985 when he's 13 years old that he's in the mentally deficient range.  At 13 years old his math skills were the 1.7 grade level.  The other subjects were from beginning to middle of fourth grade level at that point.  We've got a Wechsler full-scale IQ of a 59 in October of 1981 and in 1985 as part of that other testing there – I went out of sequence a little bit.  The full scale IQ was a 63 at that point.  In 1987 there was more testing at the Dayton School District.  He moved around a little bit with school districts.  There was a full scale IQ of a 66 at that point.  In 1990 when he's in the 11th or 12th grade he had a full scale IQ of 73 at that point.  All of those were plus or minus three points on the reliability there with the standard deviation.  So during that timeframe before age 26 basically all of them fall – one is under the – this 59 for 12.05 part "B" there.  All of the others would – would fall certainly within the standard deviation of being in 12.05C with some other additional impairment here.  He did have some neuropsychological testing done more recently, that's Dr. Ogrocki.  That is in the record.  Dr. Ogrocki notes that he had – that he had to take a lower level difficulty test battery due to his low IQ and degree of cognitive impairment and he still obtained a full-scale IQ now many years after school of 50.  He had a fourth grade reading and spelling level and a kindergarten math level.  At that point Dr. Ogrocki was indicating there would be great difficulty in maintaining any employment with those kind of difficulties there.  This is consistent also with what Dr. Whitlow said in her consultative exam findings indicating he'd have great difficulty in being able to handle even simple, routine tasks and being able to handle stressors and pressures we might see in normal, everyday competitive work.  But she didn't have any testing or anything to back it up, so that decision wasn't followed at the – at the DDS level. You do have some prior filing [consultative examinations] from Dr. Pickholtz as well who was more in the moderate kind of range, but he had no testing either to – to back anything up there.  As far as the other impairments go, he does have significant physical and mental problems in the record here that could easily satisfy the additional requirement in 12.05c.

(Tr. 99-101.)

The ALJ proceeded to question Gaddis about his impairments and treatment history.

Gaddis testified to the following:

- He lives with his wife, two children, and his in-laws.  (Tr. 105.)  He does not do any cooking, grocery shopping, laundry, or yardwork.  (Tr. 106.)  He is able to bathe and shower, but he does not drive.  (*Id*.)  He has never been able to drive and he does not know how to use public transportation.  (Tr. 107.)

13

- He graduated high school and was in special education classes.  (*Id*.)  He was in a special education classroom for half of the day and would also take speech classes.  (Tr. 108.)  He is able to use a computer.  (*Id*.)  He required a great deal of help with math and reading as a child.  (Tr. 116.)

- He worked for various stores and companies as a stocker.  (Tr. 110-112.)  He often lost these jobs due to being "too slow."  (Tr. 114.)  He attempted to work as a greeter at a store, but the job did not go well and he became frustrated.  (Tr. 116.)

- He previously received Social Security Disability benefits, after his dad helped him apply in 2004.  (Tr. 117.)

- He has back pain and it radiates into his feet.  (Tr. 118.)  Standing for extended periods exacerbates his pain.  (*Id*.)  He can walk for 5-10 minutes before he begins to experience pain.  (Tr. 119.)   He also experiences pain after sitting for long periods.  (*Id*.)

- He has daily headaches.  (Tr. 120.)  He is depressed.  (*Id*.)  He experiences mood swings and crying spells.  (*Id*.)

The VE testified Gaddis had past work as a stock clerk, but "saw no past relevant work based on the amount of hours."  (Tr. 125.)  The ALJ then posed the following hypothetical question:

> First off I would like you to consider a person with the same age, education and past work as the claimant who is able to occasionally lift and carry 20 pounds and frequently lift and carry ten pounds, is able to stand and walk six hours of an eight-hour workday, is able to sit for six hours of an eight-hour workday, would have unlimited push and pull other than shown for lift and/or carry, could occasionally climb ramps and stairs, could never climb ladders, ropes or scaffolds, could frequently balance, kneel and crouch and could occasionally stoop and crawl.  In addition, this hypothetical individual can perform simple, routine tasks consistent with unskilled work with no fast face[sic] or high production quotas and with infrequent change.

(Tr. 125-126.)

The VE testified the hypothetical individual would not be able to perform Gaddis' past work as stock clerk.  (Tr. 126.)  The VE further explained the hypothetical individual would be

14

able to perform other representative jobs in the economy, such as housekeeping cleaner (D.O.T. #323.687-014); sales attendant (D.O.T. #299.677-010); and mail clerk (D.O.T. #209.687-026). (*Id*.)  The ALJ proceeded to add an additional limitation to the hypothetical:

> I'd like you to further assume that this hypothetical individual can perform what I call low-stress work.  And by that I mean no arbitration, negotiation, responsibility for the safety of others and/or supervisory responsibility.

(Tr. 126-127.)  The VE testified the hypothetical individual would still be able to perform the jobs provided.  (Tr. 127.)

## III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r*

*of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Gaddis was insured on his alleged disability onset date, October 1, 2012, and remains insured through December 31, 2018, his date last insured ("DLI.")  (Tr. 69.)  Therefore, in order to be entitled to POD and DIB, Gaddis must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

16

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.   The claimant has not engaged in substantial gainful activity since October 1, 2012, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.   The claimant has the following severe impairments: lumbar degenerative disc disease, obesity, migraine headaches, affective disorder (persistent depressive disorder/depressive disorder, NOS mild/bipolar disorder/mood disorder), borderline intellectual functioning (intellectual disability, moderate/learning disorder, NOS), and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), consisting of lifting or carrying no more than twenty pounds with frequent lifting or carrying of objects weighing up to ten pounds with no additional limitations in his ability [to] push or pull. The claimant is able to sit for six hours in an eight-hour workday and stand or walk for six hours in an eight-hour workday.  The claimant can frequently balance, kneel, and crouch.  He also can occasionally stoop, crawl, and climb ramps and stairs, but never climb ladders, ropes, and scaffolds.  The claimant can perform simple routine tasks (unskilled work) with no fast pace or high production quotas.  He can deal with infrequent change and perform low stress work, meaning no arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility.

6.   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on December 30, 1971 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

17

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 69-81.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are

18

not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

19

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  Listing 12.05

Gaddis argues he meets the requirements of Listing 12.05C and is disabled.  (Doc. No. 14 at 7.)  He notes the record contains "valid IQ scores of 63 and 66," which the ALJ "does not even mention."  (*Id*.)  In addition, he asserts the scores above 70 are "well within the margin of area[sic] contemplated by the SSA itself."  (*Id*.)  Gaddis contends remand is appropriate, "for further hearing to consider whether the additional tests, which were ignored completely, are valid."  (*Id*.)

The Commissioner maintains the ALJ properly considered Listing 12.05C.  (Doc. No. 16 at 6.)  The Commissioner argues since the lower scores "preceded [Gaddis'] sixteenth birthday," they are "less reliable and valid than his IQ testing from 1990, at age 18, which showed a Full Scale score of 73."  (*Id.* at 7, 8.)  The Commissioner asserts the "ALJ's finding that [Gaddis] did not meet Listing 12.05C is fully supported by expert medical opinion," noting the opinions of the state agency physicians.  (*Id*. at 8.)  Finally, the Commissioner contends "the ALJ was not required to discuss [Gaddis'] 1985 and 1987 scores as they were outdated and less accurate."  (*Id*. at 9.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491

(6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec*., 424 Fed. Appx. 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently

21

clear the reasons for his decision.  *Id.* at 416-17.

As noted above, Gaddis argues the ALJ erred in finding he did not meet Listing 12.05C.

At the time[5] of the ALJ's December 2016 decision, Listing 12.05C provided, in relevant part:

> **12.05  Intellectual  disability**:  Intellectual  disability  refers  to  significantly
> subaverage general intellectual functioning with deficits in adaptive functioning
> initially  manifested  during  the  developmental  period;  i.e.,  the  evidence
> demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
> other  mental  impairment  imposing  an  additional  and  significant  work-related
> limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1.  "Under each [intellectual disability] listing, including

Listing 12.05(C), a claimant must establish that [his] impairment: (1) satisfies the 'diagnostic

description in the introductory paragraph *and* any one of the four sets of criteria.' "  *Oddo v.*

*Astrue*, 2012 WL 7017622, *3 (N.D. Ohio Dec. 10, 2012) (quoting 20 C.F.R. pt. 404, Subpt. P,

App. 1, § 12.00(A)) (emphasis in original), adopted by, *Oddo v. Comm'r of Soc. Sec.*, 2013 WL

486276 (N.D. Ohio Feb. 6, 2013); *see also Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

---

[5]     The Court notes the Social Security Administration updated Listing 12.05C,
effective January 17, 2017.  In the Revised Criteria for Evaluating Mental
Disorders, the Agency "reorganized the requirements of listing 12.05 to reflect
the three diagnostic criteria for intellectual disability from the DSM-5 and the
AAIDD. Listing 12.05 now has two paragraphs:12.05A for claimants whose
cognitive limitations prevent them from being able to take a standardized
intelligence test and 12.05B for claimants who are able to take a standardized
intelligence test."  *See* 81 Fed. Reg. 66138-01 at 66150.  The current version of
Listing 12.05 still requires claimants to demonstrate significantly subaverage
intellectual functioning, deficits in adaptive functioning, and onset prior to the age
of 22.

Thus, at the time of the ALJ's December 2016 decision, Gaddis was required to show

that he had: "(1) significantly subaverage general intellectual functioning with deficits in

adaptive functioning prior to age twenty-two; (2) a valid verbal, performance, or full scale IQ of

60 to 70; and (3) another physical or mental impairment imposing an additional and significant

work-related limitation of function," in order to meeting Listing 12.05C.  *Peterson v. Comm'r of*

*Soc. Sec*., 552 F. Appx 533, 539 (6th Cir. 2014) (citing 20 C.F.R. Pt. 404, Subpt. P, Appx 1, §§

12.00A, 12.05C).

Here, the ALJ provided the following discussion at step three:

> The severity of the claimant's mental impairments, considered singly and
> in combination, do not meet or medically equal the criteria of listings
> 12.04, 12.05, and 12.06.  In making this finding, the undersigned has
> considered whether the "paragraph B" criteria ("paragraph D" criteria of
> listing 12.05) are satisfied.  To satisfy the "paragraph B" criteria
> ("paragraph D" criteria of listing 12.05), the mental impairments must
> result in at least two of the following: marked restriction of activities of
> daily living, marked difficulties in maintaining social functioning, marked
> difficulties in maintaining concentration, persistence, or pace; or repeated
> episodes of decompensation, each of extended duration.

(Tr. 71.)  The ALJ proceeded to find moderate restrictions in activities of daily living, mild

difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and

no episodes of decompensation.  (Tr. 71-72.)  The ALJ went on to further discuss Listing 12.05:

> Turning back to listing 12.05, the requirements of paragraph A are met
> when there is mental incapacity evidenced by dependance upon others for
> personal needs (e.g., toileting, eating, dressing, or bathing) and an inability
> to follow directions, such that the use of standardized measures of
> intellectual functioning are precluded.  In this case, these requirements are
> not met based on the claimant's own allegations.
>
> The undersigned does note the claimant's full-scale IQ score of 50 in
> March of 2016 (Ex. 20F).  However, Listing 12.05 requires "the evidence
> demonstrates or supports onset of the impairment before age 22."  While
> there is evidence of some developmental disability prior to the age of 22,

the claimant's intellectual and developmental deficits were not as severely pronounced.  As noted by Dr. Ogrocki, the claimant's full scale IQ in 1990 was 73, 23 points higher than in March of 2016 (Ex. 20F, 5 *see also* 13F, 20).  The undersigned finds this valid IQ score of 73 in 1990 precludes a finding that the claimant meets Listing 12.05 B, C, or D as there is no evidence of an event that could account for the sharp decrease in IQ scores.  However, even if there were an event to account for the significant decreased[sic] in the claimant's IQ scores, these would still not establish not a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" as the scores that would demonstrate this this[sic] were from more than twenty years after the claimant turned 22.

(Tr. 72-73.)

The Court finds the ALJ's analysis and conclusions regarding Listing 12.05 are not supported by substantial evidence.  At the outset, the Court notes neither party disputes Gaddis has "another physical or mental impairment imposing an additional and significant work-related limitation of function," as required under Listing 12.05C.  (*See* Doc. No. 16 at 7, Doc. No. 14 at 7.)  Thus, the Court will contain the discussion and analysis to the remaining requirements set forth under Listing 12.05C – (1) a valid verbal, performance, or full scale IQ of 60 to 70 and (2) significantly subaverage general intellectual functioning with deficits in adaptive functioning prior to age twenty-two.  *See Peterson*, 552 F. Appx at 539 (citing 20 C.F.R. Pt. 404, Subpt. P, Appx 1, §§ 12.00A, 12.05C).

A review of Gaddis' educational and treatment records reveals Gaddis has consistently received IQ scores in the requisite range for Listing 12.05C.  In 1981, Gaddis underwent the Wechsler Intelligence Scale for Children ("WISC-R") and obtained verbal IQ of 68, a performance IQ of 55, and a full scale IQ of 59.  (Tr. 358.)  In 1985, he underwent the WISC-R again, scoring a verbal IQ of 66, a performance IQ of 65(69), and a full scale IQ of 63.  (Tr. 358.)  In 1987, Gaddis's WISC-R results revealed a verbal IQ score of 66, a performance IQ score of

70, and a full scale IQ of 66.  (Tr. 364.)  At the administrative hearing, counsel for Gaddis argued

Gaddis met Listing 12.05 based upon these IQ scores.  (Tr. 98-101.)  Despite this argument by

counsel, the ALJ did not mention or analyze these scores in the decision.

Rather, the ALJ focused WAIS-R testing Gaddis underwent in 1990, at the age of 18,

which yielded a verbal IQ of 72, a performance IQ of 75, and a full scale IQ of 73.  (Tr. 72, 369.)

By limiting her focus to Gaddis' non-qualifying score from 1990, the ALJ improperly ignored[6]

the other IQ scores contained in the record, which were in Listing range.  *See Craig v. Comm'r of

Soc. Sec*., 2015 WL 8207480, at *14 (S.D. Ohio Dec. 7, 2015).  *See also Lingo v. Colvin*, 2013

WL 6859870, *4 (N.D. Ohio Dec. 29, 2013)("[F]ocusing on the non-qualifying IQ score to the

exclusion of other evidence that may be relevant to the age-of-onset requirement is inconsistent

with the substantial evidence standard."); *Hill v. Comm'r of Soc. Sec.*, 2015 WL 105097, *6

(S.D. Ohio Jan. 7, 2015)("the ALJ was not free to then ignore all of the other IQ tests and

supporting evidence in the record which showed qualifying IQ scores of 60 to 70.").

The Commissioner acknowledges the ALJ never addressed these scores, but argues this

omission was of no consequence as "they were outdated and less accurate."  (Doc. No. 16 at 9.)

---

[6]     The Court acknowledges the Sixth Circuit, in *Peterson v. Comm'r of Soc. Sec.,*
552 Fed. App'x 533 (2014), did not find error when an ALJ failed to specifically
discuss an IQ test.  *Id*. at 539-540.  The Sixth Circuit reasoned since the ALJ
concurred with the opinions of the reviewing state agency physicians, who had
considered this IQ score in their findings, the ALJ's failure to explicitly address
the IQ tests results did "not indicate that he disregarded these results or that his
decision was not supported by substantial evidence."  *Id*.  Here, however, while
the ALJ concurred with the findings of the reviewing state agency physicians,
these physicians did not have access of the ignored IQ scores when conducting
their review.  Thus, it is unclear if the ALJ disregarded these results or did not
review them at all.  Regardless, there has been no discussion of these IQ results at
any level of review.

In support of this argument, the Commissioner notes a regulation[7] which provides IQ test results obtained between the ages of seven and sixteen are only considered valid for two years when the IQ score is 40 and above.  (Doc. No. 16 at 7.)  *See also* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 112.00(D)(10).  However, as the ALJ did not provide any discussion or acknowledgment of these scores, the Court declines to engage in such *post hoc* rationalization in determining whether or not these scores are valid.  When viewing the decision as a whole, the Court is unable to ascertain if the ALJ disregarded these scores because of when they were taken, or simply overlooked their existence.  *See Penn v. Comm'r of Soc. Sec.*, 2018 WL 4539334, *3 (N.D. Ohio Sept. 21, 2018)("While the Commissioner asserts these results are outdated and cannot be used to establish meeting or equaling a Listing, even if true that did not preclude the ALJ from mentioning them and comparing them to Dr. Pickholtz's results in weighing and analyzing the record evidence.").

Assuming, *arguendo*, these scores are "outdated and less accurate" because they were obtained prior to age 16, they still provide some evidence of the other requirement under Listing 12.05C.  Indeed, Gaddis must also establish the "additional factors" in the diagnostic description—1) subaverage intellectual functioning; 2) onset before the age of twenty-two; and 3) adaptive-skills limitations.  *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 7 (6th Cir.2004).

---

[7]     The Commissioner cites to Listing 112.00(D)(10) in support of this argument. (Doc. No. 16 at 7.)  However, the provision cited deals specifically with intellectual disability under Listing 112.05, which pertains to mental disorders for children under the age of 18. Here, Gaddis is advancing an argument under Listing 12.05C, not under Listing 112.05.  *See also Dragon v. Comm'r of Soc. Sec.*, 470 Fed. App'x 454, Fn 2 (6th Cir 2012)("Disregarding the scores on this ground misconstrues the relevance of the scores; indeed an older score was relevant to establish the manifestation of [] impairment before the age of 22.").

These low IQ scores provide ample evidence Gaddis had subaverage intellectual functioning prior to age 22.  *See Dragon*, 470 Fed. App'x at 460-461 (finding IQ test scores from childhood relevant to establish subaverage intellectual functioning prior to age 22.)  Moreover, the associated educational records provide further evidence of subaverage intellectual functioning, as well as adaptive skills limitations.  At the age of 13, testing indicated Gaddis' "overall cognitive ability" was in the first to fifth percentile.  (Tr. 361.)  At the age of 14, he was noted to be "somewhere between that associated with learning disabled and developmentally handicapped." (Tr. 363.)  It was further noted Gaddis could "read words but may not exhibit functional reading skills requiring comprehension and responding."  (Tr. 364.)  With respect to adaptive skills limitations, Gaddis's diagnostic evaluation, performed at the age of 18, revealed Gaddis would require "guided attention to be able to tackle the jobs, expectations, and responsibilities thrust upon him as an adult" and "more structured experiences to be able to handle adulthood."  (Tr. 374.)  A career placement survey indicated Gaddis was "below average" to "very low" in all tested areas.  (Tr. 368.)  This evidence strongly suggests Gaddis demonstrates the requisite adaptive-skills limitations for Listing 12.05C.

The ALJ failed to discuss or acknowledge any of this evidence.  Rather, in the decision, the only portion of these educational records the ALJ references is the IQ score of 73 and the fact Gaddis "did graduate from high school with special education assistance."  (Tr. 72.)  While the ALJ is not expected to discuss or cite each and every piece of evidence contained in the record, the amount of educational records and IQ scores the ALJ did not discuss when evaluating Gaddis under Listing 12.05C is considerable.  These omissions are especially concerning in light of the fact a 12.05C argument was raised at the hearing, with these specific IQ tests and educational

records being referenced.  Instead, the only piece of information from the educational records the ALJ found worthy of discussion was Gaddis' ability to graduate high school and his non-qualifying IQ score.  Courts have not hesitated to remand where an ALJ selectively includes only those portions of the evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").

Moreover, Gaddis did receive Listing-level IQ scores after the age of 16.  In March 2016, Gaddis obtained a full scale IQ of 50, a verbal comprehension score of 63, a perceptual reasoning score of 52, a working memory score of 50, and a processing speed score of 59.  (Tr. 964-965.)  The evaluator, Dr. Ogrocki, concluded these results were  "reliable and valid."  (Tr. 964.)  Dr. Ogrocki also observed there was "clear evidence of a developmental delay," concluding "an individual with this level of intellectual and cognitive functioning would have great difficulty maintaining employment in an unsupported/special services work environment." (Tr. 965.)

The ALJ acknowledged Dr. Ogrocki's IQ testing in the decision, noting it was 23 points lower than the score obtained in 1990.  (Tr. 72, 76.)  The ALJ determined the 1990 IQ score of 73 "precludes a finding that the claimant meets Listing 12.05 B, C, or D as there is no evidence of an event that could account for the sharp decrease in IQ scores."  (Tr. 72.)  The ALJ reasoned even if there was an event to account for this decrease in IQ scores, Gaddis still could not

28

establish a "'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period' as the scores that would demonstrate this this[sic] were from more than twenty years after the claimant turned 22." (Tr. 72-73.)

This rationale provided by the ALJ is problematic. In attempting to establish he met Listing 12.05C, Gaddis' qualifying IQ score did not have to be obtained prior to age 22. *See Lingo*, 2013 WL 6859870 at *3. Indeed, such a requirement would "foreclose recovery by all who were unfortunate enough to lack early access to appropriate testing." *Id* (quoting *McPeek v. Sec'y of Health & Human Servs.*, 19 F.3d 19, *2 (6th Cir. 1994).). Moreover, obtaining a non-qualifying score prior to age 22, such as the one Gaddis obtained in 1990, does not prevent him from satisfying the age of onset requirement contained in Listing 12.05. *Id*. at *4 (Finding a non-qualifying IQ score does not "conclusively establish" a claimant cannot satisfy the age of-onset requirement.) *See also Rhoads v. Comm'r of Soc. Sec.*, 2010 WL 5855980, *6-7 (W.D.Mich. Oct. 5, 2010) (remanding for consideration of 12.05C, despite an IQ of 73 at age seventeen, when the ALJ ignored a lower IQ score obtained at age eight and discounted a lower score obtained after age 22), *adopted by* 2011 WL 690025 (W.D.Mich. Feb. 11, 2011). Thus, it is unclear why the ALJ found Gaddis' score from 1900 to automatically "preclude" him from meeting Listing 12.05. Moreover, despite the ALJ's assertion otherwise, Gaddis obtained multiple scores prior to age 22 which demonstrated "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." The statement by the ALJ, that the only scores to provide such evidence were obtained twenty years

29

after Gaddis turned 22, further convinces the Court the ALJ did not fully consider[8] the multiple IQ scores in Gaddis' educational record.

The Commissioner further argues the ALJ's finding Gaddis did not meet Listing 12.05C "is fully supported by expert medical opinion," noting the two state agency reviewing physicians "specifically found [Gaddis] did not meet the criteria for Listing 12.05."  (Doc. No. 16 at 8.)  However, the reviewing state agency physicians did not have access to the IQ scores from 1985 or 1987, as the scores were presented at the hearing.  (Tr. 93-94.)  The state agency physicians also did review any of the educational records associated with these scores.  Moreover, other medical opinion evidence contained in the record indicated Gaddis would have "great difficulty maintaining employment in an unsupported/special services work environment" and would have "significant limitations with maintaining persistence and pace while performing simple and multi-step tasks."  (Tr. 965, 497-498.)

The Court notes Gaddis attempts to argue his IQ score of 73 was "within the margin of [error] contemplated by SSA itself."  (Doc. No. 14 at 7.)  At the time of the ALJ decision, Listing 12.05C did not contain language requiring or allowing ALJs to lower IQ test scores by any margin of error.  Additionally, the regulations "do not indicate that standard errors of measurement should be taken into consideration in determining whether an individual satisfies a limitation criteria. Incorporating a margin of error into a claimant's IQ test results would effectively expand the requisite I.Q. under [L]isting 12.05C ... [and] would alter the range of I.Q.s which satisfy [Listing 12.05C] in contradiction of federal regulations."  *Harris v. Comm'r of*

---

[8]    The Court also notes the ALJ, despite discussing it with Gaddis' counsel at the hearing, did not acknowledge or discuss the fact Gaddis had previously been awarded disability benefits from 2004-2012, possibly due to an intellectual disability.

*Soc. Sec.*, 2010 WL 749654, at *10 (S.D.Ohio Mar.1, 2010).  Accordingly, Gaddis cannot attempt to use a standard deviation argument to lower his IQ score from 1990 into Listing-level range.

Regardless, Gaddis still has raised a substantial question as to whether he could qualify as disabled under Listing 12.05C.  Indeed, Gaddis has put forth several very low IQ scores from his childhood, which the ALJ did not discuss or even acknowledge.  These IQ scores not only fall within Listing-level requirements, but they also provide evidence of subaverage intellectual functioning prior to age 22.  In addition, the educational records associated with these IQ scores also raise a substantial question as to Gaddis' adaptive functioning skills.

Accordingly, the Court finds remand is appropriate for further consideration of the undiscussed IQ scores and a more complete analysis of Gaddis' adaptive functioning and educational records.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the matter be REMANDED for further proceedings consistent with this decision.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 12, 2018

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).